# EXHIBIT A

## AGREEMENT FOR PURCHASE AND SALE OF ASSETS

This agreement (Agreement) is made as of this 24th day of December, 2015, at 51 Newark Street, Suite 404, Hoboken, New Jersey 07030, among **Life Systems Software Inc.** (Buyer), a California corporation, having its principal office at 2603 Camino Ramon, Suite 200, San Ramon, California 94583; **Life Systems, Inc.** (Seller), a New Jersey corporation, having its principal office at 75 East Main Street, Rockaway, New Jersey 07886; and **Paul B. Bindell** and **Avraham Bindell** (Shareholder), individuals located at 75 East Main Street, Rockaway, New Jersey 07886, who are all of the shareholders of Seller. Shareholder and Seller are collectively referred to in this Agreement as Selling Parties.

## RECITALS

Buyer wishes to purchase from Seller and Seller wishes to sell to Buyer, on the terms and subject to the conditions of this Agreement, all the assets described in Paragraph 1 of Division I of Seller in exchange for the cash and promissory note of Buyer described in Paragraph 3 of Division 1; Shareholder wishes this transaction to be consummated. In consideration of the mutual covenants, agreements, representations, and warranties contained in this Agreement, the parties agree as follows:

*Paragraph 1. Definitions*

As used in this Agreement, the following defined terms have the following meanings:

"Closing" means twenty-one (21) calendar days after the date and time that this Agreement is executed, mutually agreed upon by Selling Parties and Buyer, reflected with their respective signatures or marks;

"Customer" means any natural person, natural persons, company, business entity or any organization of persons or companies that receives the services of another entity in exchange for valuable consideration, which is not limited to pecuniary or financial consideration;

"Encumbrance" means any lien, pledge, hypothecation, charge, mortgage, deed of trust, security interest, encumbrance, claim, infringement, option, right of first refusal, preemptive right, community property interest, or restriction of any nature on any asset;

"Entity" means a Person other than an individual;

"Governmental Authority" means any federal, state, local, or foreign court, administrative agency or commission, or other governmental authority or instrumentality;

"Intellectual Property Rights" means, collectively, all of the following worldwide intangible legal rights, acquired by ownership, license, or other legal operation: (1) all patents, patent applications, and patent rights, including all continuations, continuations-in-part, divisions, reissues, reexaminations, and extensions of them; (2) all trademarks, trade names, logos, and service marks, registered or not; (3) all rights associated with works of authorship, including copyrights (registered or not), copyright applications, copyright registrations, moral rights, mask

1

work rights, mask work applications, and mask work registrations; (4) all inventions (patentable or not), know-how, show-how, formulas, processes, techniques, confidential business information, trade secrets, and other proprietary information, technology, and intellectual property rights; and (5) all rights to sue or make any claims for any past, present, or future misappropriation or unauthorized use of any of the foregoing rights and the right to receive income, royalties, damages, or payments that are now or will later become due with regard to the foregoing rights, excepting therefrom authorized usage of any of the foregoing rights by Selling Parties.

"Losses" means any claim, demand, loss, cost, expense, obligation, liability, damage, recovery, and deficiency, including interest, penalties, and reasonable attorney fees;

"Person" means any individual, corporation, partnership, estate, trust, company (including any limited liability company), firm, or other enterprise, association, organization, or Governmental Authority;

"Proceeding" means any claim, action, suit, investigation, or administrative or other proceeding before any Governmental Authority or any arbitration or mediation;

"Taxes" means any and all federal, state, local, or foreign taxes, assessments, and other governmental charges, duties, impositions, and liabilities relating to taxes of any kind, together with all interest, penalties, and additions imposed with respect to such amounts.

## DIVISION I
## PURCHASE AND SALE OF ASSETS

*Paragraph 1. Sale and Transfer of Assets.* Subject to the terms and conditions set forth in this Agreement, at the Closing, Seller shall sell, convey, transfer, assign, and deliver to Buyer, and Buyer shall purchase from Seller, all rights and title to and interest in the assets, as described as the following (the Assets):

(a) The Selling Parties' Intellectual Property Rights and otherwise legal rights, titles, or authorities in and to the certain and related computer software program, software code, and software documentation identified as ChiroSuiteEHR, including but not limited to any and all "Life Systems Software – Software As A Service (SaaS) Agreement[s]," "Life Systems Software License Agreement[s]," "Life Systems Software Technical Service Agreement[s]; "Life Systems Software HIPAA Business Associate Agreement[s]," and "Technical Support Renewal Statement[s]" related to ChiroSuiteEHR;

(b) The Selling Parties' Intellectual Property Rights and otherwise legal rights, titles, or authorities in and to the certain and related computer software program, software code, and software documentation identified as ChiropadEMR, including but not limited to any and all "Life Systems Software – Software As A Service (SaaS) Agreement[s]," "Life Systems Software License Agreement[s]," "Life Systems Software Technical Service Agreement[s]; "Life Systems Software HIPAA Business Associate Agreement[s]," and "Technical Support Renewal Statement[s]" related to ChiropadEMR;

Initials:_____   Initials: 

(c) The Selling Parties' Intellectual Property Rights and otherwise legal rights, titles, or authorities in and to the certain and related computer software program, software code, and software documentation identified as ChiroOffice, including but not limited to any and all "Life Systems Software – Software As A Service (SaaS) Agreement[s]," "Life Systems Software License Agreement[s]," "Life Systems Software Technical Service Agreement[s]; "Life Systems Software HIPAA Business Associate Agreement[s]," and "Technical Support Renewal Statement[s]" related to ChiroOffice;

(d) The Selling Parties' Intellectual Property Rights and otherwise legal rights, titles, or authorities in and to the certain and related computer software program, software code, and software documentation identified as ChiroSuiteEHR Cloud, including but not limited to any and all "Life Systems Software – Software As A Service (SaaS) Agreement[s]," "Life Systems Software License Agreement[s]," "Life Systems Software Technical Service Agreement[s]; "Life Systems Software HIPAA Business Associate Agreement[s]," and "Technical Support Renewal Statement[s]" related to ChiroSuiteEHR Cloud;

(e) The Selling Parties' Intellectual Property Rights and otherwise legal rights, titles, or authorities in and to the certain and related computer software program, software code, and software documentation identified as ServiceQueue, including but not limited to any and all "Life Systems Software – Software As A Service (SaaS) Agreement[s]," "Life Systems Software License Agreement[s]," "Life Systems Software Technical Service Agreement[s]; "Life Systems Software HIPAA Business Associate Agreement[s]," and "Technical Support Renewal Statement[s]" related to ServiceQueue, except that pursuant to Division III, Paragraph 6 of this Agreement, Selling Parties are entitled to and shall be issued a non-expiring, multi-user copy of the Service Queue software and its subprograms for the sole purpose of maintaining Protected Health Information records necessary to comply with requests from patients, insurance carriers, or any other authorized entity subject to compliance with state and federal laws, including maintaining corporate records necessary to comply with federal and state business regulations, laws, and rules;

(f) The Selling Parties' existing service agreements and licensing agreements, including but not limited to any and all "Life Systems Software – Software As A Service (SaaS) Agreement[s]," "Life Systems Software License Agreement[s]," "Life Systems Software Technical Service Agreement[s]; "Life Systems Software HIPAA Business Associate Agreement[s]," and "Technical Support Renewal Statement[s]";

(g) The Selling Parties' Intellectual Property Rights and otherwise legal rights, titles, or authorities of and to the "Chronic Watch Software Development Service Agreement" between Life Systems, Inc. and Chronic Watch Pvt. Ltd;

(h) The Selling Parties' Intellectual Property Rights and otherwise legal rights, titles, or authorities of and to the "ChiroSuiteEHR" trademark, registered with the United States Patent and Trademark Office, serial number 78911289, effectively registered on April 24, 2007.

(i) The Selling Parties' Intellectual Property Rights and otherwise rights, titles, or authorities of and to the "ChiroPad" trademark, registered with the United States Patent and Trademark Office, serial number 78346569, effectively registered on January 25, 2005;

Initials:_____   Initials:__

(j) The Selling Parties' Intellectual Property Rights and otherwise legal rights, titles, or authorities of and to the "ChiroOffice" trademark, registered with the United States Patent and Trademark Office, serial number 78718773, effectively registered on October 24, 2006;

(k) The Selling Parties' Intellectual Property Rights and otherwise legal rights, titles, or authorities of and to the "Paraphrase" trademark, registered with the United States Patent and Trademark Office, serial number 78346680, effectively registered on September 13, 2005;

(l) The Full Customer List for Life Systems, Inc., including complete contact information, documentation, records, and other information for all prior and existing Customers ("Customers List");

(m) The internet domain names and registrations that are held or owned by Seller related to Life Systems, Inc., the ChiroSuiteEHR software, and all marketing on behalf of Life Systems, Inc. or ChiroSuiteEHR, a list of which is attached as Exhibit E, as well as all subdomain names to the listed domain names;

(n) The internet domain and website content, including written, audio, video, recordings, or systems owned or used by Seller that is used by or related to Life Systems Inc. or the ChiroSuiteEHR family of products or services;

(o) All of Seller's electronic materials, promotional materials, marketing materials, advertising material, and all other written materials owned or used by Seller as related to the ChiroSuite or ChiroSuiteEMR family of products.

(p) All of Seller's marketing and sale information, and plans, pricing, and other related information related to the ChiroSuite or ChiroSuiteEMR family of products and services;

(q) Licenses to assets and properties of third parties as reflected in Exhibit D;

(r) The equipment, computers, or machinery owned by Seller, a list of which is attached as Exhibit C;

(s) All of Selling Parties' Intellectual Property Rights and otherwise rights, titles, or authorities of and to the telephone line for the telephone number: (800-543-3001); and

(t) All goodwill associated with Seller's business and the Assets.

*Paragraph 2. Outstanding Account Receivables.* Notwithstanding any other paragraph in this Agreement, the Assets shall not include, and Buyer shall not purchase from Seller, nor shall Seller sell to Buyer, any outstanding account receivables possessed by Seller at the time of or prior to Closing. Any and all account receivables, promissory notes, debts owed to Seller, or any outstanding obligation Seller is entitled to shall be free and clear from this Agreement, and Buyer shall have no right or entitlement to those assets. Seller shall have the right to continue to pursue collection of any outstanding account receivables as of Closing; and Buyer shall have no claim on the funds obtained by Seller for these outstanding account receivables.

*Paragraph 3. Outstanding Account Payables.* Notwithstanding any other paragraph in this Agreement, the Assets shall not include, and Buyer shall not purchase or acquire from Seller, nor shall Seller sell or assign to Buyer, any outstanding account payables possessed by Seller at the time of or prior to Closing. Any and all account payables, promissory notes owed, debts owed by

4

Initials:_____    Initials:_

seller, or any other outstanding obligation Seller is responsible for shall be free and clear from this Agreement, and Buyer shall have no responsibility or obligation to those liabilities.

*Paragraph 4. Consideration From Buyer.* As full payment for the transfer of the Assets to Buyer, Buyer shall deliver to Seller Three Hundred Seventy Thousand United States Dollars ($370,000.00 USD), in accordance with the provisions described herein, and subject to the terms and conditions described hereafter, the following (collectively, the Purchase Price):

(a) Nineteen Thousand United States Dollars ($19,000.00 USD) upon execution of this Agreement to be held in trust by Seller's attorney until Closing, at which time shall be released to Seller;

(b) Two Hundred Seventy-One Thousand United States Dollars ($271,000.00 USD) at the Closing; and

(c) Eighty Thousand United States Dollars ($80,000.00 USD) in the form of a promissory note (Note) and security agreement (Security Agreement) from Buyer to Seller, personally guaranteed by Nischal Sanghal, sole shareholder of Buyer, and attached as Exhibit A and Exhibit B, respectively.

*Paragraph 5. Tax Characterization.* Each of the parties agrees to report the transactions contemplated by this Agreement for all Tax purposes (including in Tax returns) in a manner that is consistent with the allocation of the Purchase Price described in Paragraph 2 and not to take any position inconsistent with such allocation in any Tax return, refund claim, or any litigation relating to Taxes.

**DIVISION II**
**WARRANTIES OF SELLING PARTIES**

*Paragraph 1. Seller's Warranties.* Selling Parties, jointly and severally, warrant that:

*Paragraph 2. Organization, Standing and Qualification of Seller.* Seller is a corporation duly organized, validly existing, and in good standing under the laws of New Jersey and has all necessary corporate powers to own its properties and operate its business as now owned and operated by it. Neither the ownership of its properties nor the nature of its business requires Seller to be qualified to do intrastate business as a foreign corporation in any other jurisdiction. Seller represents and warrants that Seller has not used any other business names, fictitious names, or any other addresses within the three years past.

*Paragraph 3. Compliance with Laws.* To the knowledge of Seller and Shareholder, Seller has complied in all material respects with all federal, state, and local statutes, laws, and regulations. Seller has not received any notice asserting any violation by either of them of any statute, law, or regulation that has not been remedied before the date of this Agreement.

*Paragraph 4. Litigation.* There is no pending, or, to the best knowledge of Selling Parties, threatened Proceeding against or affecting Seller or any of their businesses, assets, or financial condition.

Initials:_____     Initials:_

*Paragraph 5. Seller's Cooperation.*

(a) Selling Parties agree to cooperate and assist Buyer with technical and operational support for sixty (60) days following the Closing date. Assistance may include, but is not limited to, Selling Parties' cooperation in transitioning operations from Seller to the Buyer, as well as providing technical support to continue the servicing of all assigned contracts, licenses, obligations, and responsibilities to and for Customers.

(b) Selling Parties, at any time on or after the execution of this Agreement, shall execute, acknowledge, and deliver any further deeds, assignments, conveyances, and other assurances, documents, and instruments of transfer, reasonably requested by Buyer, and shall take any other action consistent with the terms of this Agreement that may reasonably be requested by Buyer for the purpose of assigning, transferring, granting, conveying, and confirming to Buyer, or reducing to possession, any or all property to be conveyed and transferred under this Agreement. If requested by Buyer, Selling Parties shall prosecute or otherwise enforce in its own name for the benefit and under the direction of Buyer, any claims, rights, or benefits that are transferred to Buyer under this Agreement and that require prosecution or enforcement in Seller's or Shareholder's name. Any prosecution or enforcement of claims, right, or benefits under this paragraph shall be solely at Buyer's expense, unless the prosecution or enforcement is made necessary by a breach of this Agreement by any of the Selling Parties.

(c) Selling Parties agree to fully cooperate with Buyer with all necessary actions, executions, or acknowledges pertaining to tax liabilities, obligations, tax clearances, bulk sale clearances, and all other cooperation to complete the terms of this Agreement.

(d) Selling Parties shall stop processing all charges, accounts receivables accrued on or after the date of Closing, and accounts on the date of Closing, permitting the merchant account and bank deposit information to be adjusted. Selling Parties shall not interfere or impede Buyer's rights to accounts receivables or collection of payments beginning on the date of Closing.

*Paragraph 6. Authority and Consents.* Selling Parties have the right, power, legal capacity, and authority to enter into and perform their respective obligations under this Agreement (including the sale of the Assets to Buyer), and no approvals or consents of any Persons other than Selling Parties are necessary in connection with the sale of the Assets to Buyer and the performance by Seller of its obligations under this Agreement. The execution, delivery, and performance of this Agreement by Seller and the consummation of the transactions contemplated have been duly authorized by all necessary corporate action on the part of Seller.

*Paragraph 7. MU 2014 Certification.* Selling Parties agree to guarantee completion of the MU 2014 certification regarding the Assets within 60 days after Closing at the expense of the Selling Parties. Selling Parties' failure to comply with this warranty shall constitute a material breach.

6

Initials:_____    Initials: 

*Paragraph 8. Shareholder's Competition.* In consideration for the payment by Buyer described in Paragraph 3 of Division I and as long as Buyer is in compliance with the Security Agreement and Note, Shareholder shall not, at any time within the 5-year period immediately following the Closing date, directly or indirectly engage in, or have any interest in any Entity (whether as an employee, officer, director, agent, security holder, creditor, consultant, or otherwise) that engages in any activity in the counties and cities where any existing or prior Customers are located or in the counties and cities Selling Parties have conducted any business that involved Assets, that is the same as, similar to, or competitive with any activity now engaged in by Selling Parties (or any successor or successors of either) in any of these counties or cities as long as Buyer (or any successor) engages in the activity in such county or city.

The parties intend that the covenant contained in the preceding portion of this section be construed as a series of separate covenants, one for each county and city specified or generally referenced. Except for geographic coverage, each such separate covenant shall be considered identical in terms to the covenant contained in the preceding paragraph. If, in any Proceeding, a court refuses to enforce any of the separate covenants included in this paragraph, the unenforceable covenant shall be considered eliminated from these provisions for the purpose of those Proceedings to the extent necessary to permit the remaining separate covenants to be enforced.

Shareholder shall not divulge, communicate, use to the detriment of Buyer or for the benefit of any other Person, or misuse in any way, any confidential information or trade secrets of Seller or Shareholder, including personnel information, secret processes, know-how, customer lists, recipes, formulas, or other technical data. Shareholder acknowledges and agrees that any information or data he has acquired on any of these matters or items was received in confidence and as a fiduciary of Seller and Shareholder.

## DIVISION III
## WARRANTIES OF BUYER

*Paragraph 1. Buyer's Warranties.* Buyer warrants the following:

(a) Buyer is a corporation duly organized, existing, and in good standing under the laws of California. The execution and delivery of this Agreement and the consummation of this transaction by Buyer have been duly authorized, and no further corporate authorization is necessary on the part of Buyer.

(b) No consent, approval, or authorization of, or declaration, filing, or registration with, any Governmental Authority is required to be made or obtained by Buyer in connection with the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.

(c) Buyer has completed and is satisfied with its due diligence of Seller, Selling Parties, Assets, and all liabilities or obligations.

*Paragraph 2. Authority and Consents.* Buyer has the right, power, legal capacity, and authority to enter into and perform their respective obligations under this Agreement (including

Initials:_____   Initials:___NS

the purchase of the Assets from Selling Parties), and no approvals or consents of any Persons other than Buyer is necessary in connection with the sale of the Assets to Buyer and the performance by Buyer of its obligations under this Agreement. The execution, delivery, and performance of this Agreement by Buyer and the consummation of the transactions contemplated have been duly authorized by all necessary corporate action on the part of Buyer.

*Paragraph 3. No Unreasonable Delay.* Buyer shall not unreasonably delay or unnecessarily refuse to perform services to clients or Customers originated from the Assets purchased from Seller. Buyer shall make all reasonable efforts to continue to provide uninterrupted service and support to such clients or Customers. Buyer acknowledges that time is of the essence with respect to all services rendered to clients or customers originating from the Assets purchased from Seller.

*Paragraph 4. Assumption of Liabilities.* From and after the Closing, Buyer shall assume all of Selling Parties' rights and obligations arising under the ownership and maintenance of the Assets transferred under this Agreement.

*Paragraph 5. Bulk Sale Clearance.* Following the execution of this Agreement, Buyer shall provide proper notice to the relevant Governmental Authority of the Agreement to obtain a tax clearance certificate.

*Paragraph 6. Issuance of Software to Shareholder.* It is acknowledged that Shareholder has used the ChiroSuiteEHR software in Shareholder's practice for patient records, also known as Protected Health Information ("PHI"), and is required by applicable chiropractic laws to retain this PHI for many years. For this reason, Buyer agrees to issue a non-expiring, multi-user copy of the ChiroSuiteEHR software and its subprograms, as described in sections A, B, and F in Division I of this agreement, for the sole purpose of maintaining the PHI records necessary to comply with requests from patients, insurance carriers, or any other authorized entity. Shareholder may not sell, market, or use the ChiroSuiteEHR software or its subprograms for any other purpose than maintaining PHI as required pursuant to applicable laws. Shareholder's failure to comply with this limited use scope shall constitute a material breach of this Agreement.

## DIVISION IV
## OBLIGATIONS AT CLOSING

*Paragraph 1. Time and Place.* The sale and transfer of the Assets by Seller to Buyer (the Closing) shall take place at the offices of Joseph D. Greco, Jr., Esq., attorney for Selling Parties, at 51 Newark Street, Suite 404, Hoboken, NJ 07030, at 10:00 a.m. local time, on twenty-one (21) days after the execution of this Agreement, or at such other time and place as the parties may agree to in writing.

*Paragraph 2. Selling Party's Obligations at Closing.* At the Closing, with the consummation of the transfer, Seller, through its officers, agents, and employees, will put Buyer into full possession and enjoyment of all assets to be conveyed and transferred by this Agreement, including but not limited to:

8

Initials:_____   Initials:__

(a) Assignments of all leaseholds, service agreements, and all other agreements involving Assets, properly executed and acknowledged by Corporation, and accompanied by all consents of lessors and necessary parties required by this Agreement and the leases or agreements being assigned;

(b) Instruments of assignment and transfer of all other property of Corporation of every kind and description and wherever situated, including all its interest in trademarks identified in Paragraph 1 of Division I; all other trademarks, rights under agreements; trade names; copyrights, and other tangible or intangible property, subject to the terms and conditions of the Security Agreement and Note;

(c) Certified resolutions of Seller's board of directors, in form satisfactory to counsel for Buyer, authorizing the execution and performance of this Agreement and all actions to be taken by Selling Parties under this Agreement; and

(d) All equipment, computers, and machinery of the Assets shall be shipped by Selling Parties to Buyer at Broker's sole expense.

*Paragraph 3. Buyer's Obligations at Closing.* At the Closing, consistent with Paragraph 3 of Division I, Buyer shall deliver to the Seller:

(a) A wire transfer in immediately available funds in the amount of $271,000.00 USD;

(b) A fully executed promissory note, reflected in Exhibit A of this Agreement, in the amount of $80,000.00 USD;

(c) Authorization for the immediate release of the $19,000.00 USD held in the attorney escrow account of Selling Parties' attorney as described in Division I, Paragraph 4(a).

## DIVISION V
## OBLIGATIONS AFTER CLOSING

*Paragraph 1. Buyer's Obligations After Closing.* After the Closing, Buyer shall deliver or cause to be delivered to Selling Parties all required Royalties, future payments, documents, records, invoices, statements, accounting access, and e-mails in accordance with Division I, Paragraph 3, and all of Buyer's obligations in fulfilling and fully satisfying the Purchase Price under this Agreement.

*Paragraph 2. Buyer's Indemnity.* From and after the Closing, Buyer shall indemnify and hold harmless Shareholder and Seller against, and in respect of, all claims, judgments, damages, penalties, fines, costs, liabilities or losses which arise during or after the Closing from any of the services rendered by Buyer.

*Paragraph 3. Seller's Indemnity.* From and after the Closing, Seller and Shareholder shall, jointly and severally, indemnify and hold harmless Buyer against and in respect of, all claims, judgments, damages, penalties, fines, costs, liabilities or losses that Buyer, its directors, officers, employees, or shareholders may incur or suffer that arise from any breach of or failure by Selling Parties to perform any of their representations, warranties or agreements prior to and up until the Closing.

9

Initials:_____   Initials:

*Paragraph 4. Seller's Dissolution.* Seller must remain active following the Closing until Seller has received all payments under this Agreement, the Security Agreement, and the Note. After such time, Seller shall take all action required to dissolve and settle its bona fide debts, and distribute to shareholders, in the manner provided by this paragraph but in compliance with applicable law, all its remaining right, title, and interest in and to its assets (other than the Assets being sold to Buyer under this Agreement), including the consideration to be received by it under this Agreement; and as soon as practicable after the closing date, to liquidate completely and terminate its corporate existence. From and after the Closing, Seller shall not engage in any other business or activity, except as required under this Agreement or to complete its liquidation and dissolution. Seller will be dissolved only after full and complete payment and compliance with the terms of the Security Agreement and Note.

## DIVISION VI
## COMMISSIONS

*Paragraph 1.* Selling Parties represents and warrants that it has contracted with Synergy Business Brokers LLC ("Broker") in connection with the engagement of this Agreement. Selling Parties further represents and warrants that in contracting with Broker, Selling Parties shall pay Broker a commission fee in the sum of Thirty Thousand Seven Hundred United States Dollars ($30,700.00 USD). Selling Parties is solely responsible for this fee.

*Paragraph 2.* Selling Parties and Buyer each indemnify and hold harmless one another against any Losses incurred by reason of any brokerage or other commission or finder's fee alleged to be payable because of any act, omission, or statement of the indemnifying party.

## DIVISION VII
## FORM OF AGREEMENT

*Paragraph 1. Effect of Headings.* The subject headings of the paragraphs and subparagraphs of this Agreement are included for convenience only and shall not affect the construction or interpretation of any of its provisions.

*Paragraph 2. Word Usage.* Unless the context clearly requires otherwise:

(a) Plural and singular numbers shall each be considered to include the other;

(b) The masculine, feminine, and neuter genders shall each be considered to include the others;

(c) "Or" is not exclusive;

(d) "Includes" and "including" are not limiting;

(e) Reference to any statute is a reference to that statute as amended to the date of this Agreement;

10

Initials:_____     Initials:___NS___

(f) Reference to any document is to that document, as amended to the date of this Agreement, including all exhibits and schedules, if any; and

(g) "Known to" or "knowledge of" a party means, with respect to any fact, circumstance, event, or other matter in question, the actual knowledge of it with respect to an individual, if knowledge refers to the knowledge of an individual, and of an officer or director of a party if knowledge refers to a party that is not an individual.

*Paragraph 3. Entire Agreement; Modification; Waiver.* This agreement constitutes the entire agreement between the parties pertaining to the subject matter contained in it and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties. No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by all the parties. No waiver of any of the provisions of this Agreement shall be considered, or shall constitute, a waiver of any other provision, and no waiver shall constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

*Paragraph 4. Counterparts.* Executed counterparts of this Agreement may be delivered by facsimile transmission or by delivery of a scanned counterpart in portable document format (PDF) by e-mail, in either case with delivery confirmed. On such confirmed delivery, the signatures in the facsimile or PDF data file shall be deemed to have the same force and effect as if the manually signed counterpart had been delivered to the other party in person.

*Paragraph 5. Governing Law.* This Agreement shall be construed in accordance with, and governed by, the laws of the State of New Jersey as applied to contracts that are executed and performed entirely in the State of New Jersey.

*Paragraph 6. Severability.* If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, it is the intent of the parties that all other provisions of this Agreement be construed to remain fully valid and enforceable

## DIVISION VIII
## PARTIES

*Paragraph 1. Parties in Interest.* Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under, or by reason of, this Agreement on any Persons other than the parties to it and their respective successors and assigns; nothing in this Agreement is intended to relieve or discharge the obligation or liability of any third party to any party to this Agreement; and no provision shall give any third party any right of subrogation or claim against any party to this Agreement.

*Paragraph 2. Assignment.* This agreement shall be binding on, and shall inure to the benefit of, the parties to it and their respective heirs, legal representatives, successors, and assigns, provided that the Selling Parties may not assign their obligations under this Agreement, and before the closing, Buyer may not assign any of its rights under this Agreement except to a wholly owned subsidiary corporation of Buyer. No such assignment by Buyer to its wholly owned subsidiary shall relieve Buyer of any of its obligations or duties under this Agreement.

11

Initials:_____    Initials:_

*Paragraph 3. Notices.* All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be considered to have been duly given on the date of service if served personally on the party to whom notice is to be given, or on the third day after mailing if mailed to the party to whom notice is to be given, by first-class mail, registered or certified, postage prepaid, and properly addressed as follows:

| To Selling Parties: | Dr. Paul B. Bindell | Joseph D. Greco, Jr. |
| | Life Systems, Inc. | Joseph D. Greco, Jr., Esq., LLC |
| | 75 East Main Street | 51 Newark St, Ste 404 |
| | Rockaway, NJ 07866 | Hoboken, NJ 07030 |
| | | |
| To Buyer at: | Life Systems Software Inc. | Alvin H. Lee |
| | Attention: Nischal Sanghal | Law Offices of Alvin H. Lee |
| | 2603 Camino Ramon, Ste 200 | 6400 Village Pkwy, Ste 201 |
| | San Ramon, CA 94583 | Dublin, CA 94568 |

Each party agrees to notify the other in the event of a move within fourteen calendar days of such move until the Note has been satisfied in full.

## DIVISION IX
## REMEDIES

*Paragraph 1. Damages for Breach.* It is acknowledged that a breach of the Agreement by either party shall cause the non-breaching party to incur substantial economic damages and losses of types and in amounts that cannot be anticipated. Accordingly, Seller and Selling Parties agree that Buyer is entitled to seek all actual damages Buyer suffers as a result of Seller or Selling Parties' breach of this Agreement. Buyer agrees that Seller or Selling Parties are entitled to seek all actual damages Seller or Selling Parties suffer as a result of Buyer's breach of this Agreement, taking into account Seller or Selling Parties' reacquisition of the assets subject to the Note and Security Agreement.

*Paragraph 2. Recovery of Litigation Costs.* If any legal Proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorney fees and other costs incurred in that Proceeding, in addition to any other relief to which they may be entitled.

## DIVISION X
## NATURE AND SURVIVAL OF REPRESENTATIONS AND OBLIGATIONS

*Paragraph 1. Nature and Survival of Representations and Obligations.* No representations or warranties whatever are made by any party except as specifically set forth in this Agreement or other writing provided for in this Agreement. All statements contained in any of these instruments or other writings shall be considered to be warranties under this Agreement. The

12

Initials:_____    Initials: NJ

warranties, covenants, and promises herein shall survive the Closing date until all covenants, obligations, and responsibilities under this Agreement have been fully and completely satisfied.

*[The remainder of this page intentionally left blank.*

Initials:_____   Initials:_____

# AGREEMENT FOR PURCHASE AND SALE OF ASSETS

This agreement (Agreement) is made as of this 24th day of December, 2015, at 51 Newark Street, Suite 404, Hoboken, New Jersey 07030, among **Life Systems Software Inc.** (Buyer), a California corporation, having its principal office at 2603 Camino Ramon, Suite 200, San Ramon, California 94583; **Life Systems, Inc.** (Seller), a New Jersey corporation, having its principal office at 75 East Main Street, Rockaway, New Jersey 07886; and **Paul B. Bindell** and **Avraham Bindell** (Shareholder), individuals located at 75 East Main Street, Rockaway, New Jersey 07886, who are all of the shareholders of Seller. Shareholder and Seller are collectively referred to in this Agreement as Selling Parties.

# RECITALS

Buyer wishes to purchase from Seller and Seller wishes to sell to Buyer, on the terms and subject to the conditions of this Agreement, all the assets described in Paragraph 1 of Division I of Seller in exchange for the cash and promissory note of Buyer described in Paragraph 3 of Division 1; Shareholder wishes this transaction to be consummated. In consideration of the mutual covenants, agreements, representations, and warranties contained in this Agreement, the parties agree as follows:

*Paragraph 1. Definitions*

As used in this Agreement, the following defined terms have the following meanings:

"Closing" means twenty-one (21) calendar days after the date and time that this Agreement is executed, mutually agreed upon by Selling Parties and Buyer, reflected with their respective signatures or marks;

"Customer" means any natural person, natural persons, company, business entity or any organization of persons or companies that receives the services of another entity in exchange for valuable consideration, which is not limited to pecuniary or financial consideration;

"Encumbrance" means any lien, pledge, hypothecation, charge, mortgage, deed of trust, security interest, encumbrance, claim, infringement, option, right of first refusal, preemptive right, community property interest, or restriction of any nature on any asset;

"Entity" means a Person other than an individual;

"Governmental Authority" means any federal, state, local, or foreign court, administrative agency or commission, or other governmental authority or instrumentality;

"Intellectual Property Rights" means, collectively, all of the following worldwide intangible legal rights, acquired by ownership, license, or other legal operation: (1) all patents, patent applications, and patent rights, including all continuations, continuations-in-part, divisions, reissues, reexaminations, and extensions of them; (2) all trademarks, trade names, logos, and service marks, registered or not; (3) all rights associated with works of authorship, including copyrights (registered or not), copyright applications, copyright registrations, moral rights, mask

work rights, mask work applications, and mask work registrations; (4) all inventions (patentable or not), know-how, show-how, formulas, processes, techniques, confidential business information, trade secrets, and other proprietary information, technology, and intellectual property rights; and (5) all rights to sue or make any claims for any past, present, or future misappropriation or unauthorized use of any of the foregoing rights and the right to receive income, royalties, damages, or payments that are now or will later become due with regard to the foregoing rights, excepting therefrom authorized usage of any of the foregoing rights by Selling Parties.

"Losses" means any claim, demand, loss, cost, expense, obligation, liability, damage, recovery, and deficiency, including interest, penalties, and reasonable attorney fees;

"Person" means any individual, corporation, partnership, estate, trust, company (including any limited liability company), firm, or other enterprise, association, organization, or Governmental Authority;

"Proceeding" means any claim, action, suit, investigation, or administrative or other proceeding before any Governmental Authority or any arbitration or mediation;

"Taxes" means any and all federal, state, local, or foreign taxes, assessments, and other governmental charges, duties, impositions, and liabilities relating to taxes of any kind, together with all interest, penalties, and additions imposed with respect to such amounts.

## DIVISION I
## PURCHASE AND SALE OF ASSETS

*Paragraph 1. Sale and Transfer of Assets.* Subject to the terms and conditions set forth in this Agreement, at the Closing, Seller shall sell, convey, transfer, assign, and deliver to Buyer, and Buyer shall purchase from Seller, all rights and title to and interest in the assets, as described as the following (the Assets):

(a) The Selling Parties' Intellectual Property Rights and otherwise legal rights, titles, or authorities in and to the certain and related computer software program, software code, and software documentation identified as ChiroSuiteEHR, including but not limited to any and all "Life Systems Software – Software As A Service (SaaS) Agreement[s]," "Life Systems Software License Agreement[s]," "Life Systems Software Technical Service Agreement[s]; "Life Systems Software HIPAA Business Associate Agreement[s]," and "Technical Support Renewal Statement[s]" related to ChiroSuiteEHR;

(b) The Selling Parties' Intellectual Property Rights and otherwise legal rights, titles, or authorities in and to the certain and related computer software program, software code, and software documentation identified as ChiropadEMR, including but not limited to any and all "Life Systems Software – Software As A Service (SaaS) Agreement[s]," "Life Systems Software License Agreement[s]," "Life Systems Software Technical Service Agreement[s]; "Life Systems Software HIPAA Business Associate Agreement[s]," and "Technical Support Renewal Statement[s]" related to ChiropadEMR;

Initials:_____   Initials:_____

*AB*

(c) The Selling Parties' Intellectual Property Rights and otherwise legal rights, titles, or authorities in and to the certain and related computer software program, software code, and software documentation identified as ChiroOffice, including but not limited to any and all "Life Systems Software – Software As A Service (SaaS) Agreement[s]," "Life Systems Software License Agreement[s]," "Life Systems Software Technical Service Agreement[s]; "Life Systems Software HIPAA Business Associate Agreement[s]," and "Technical Support Renewal Statement[s]" related to ChiroOffice;

(d) The Selling Parties' Intellectual Property Rights and otherwise legal rights, titles, or authorities in and to the certain and related computer software program, software code, and software documentation identified as ChiroSuiteEHR Cloud, including but not limited to any and all "Life Systems Software – Software As A Service (SaaS) Agreement[s]," "Life Systems Software License Agreement[s]," "Life Systems Software Technical Service Agreement[s]; "Life Systems Software HIPAA Business Associate Agreement[s]," and "Technical Support Renewal Statement[s]" related to ChiroSuiteEHR Cloud;

(e) The Selling Parties' Intellectual Property Rights and otherwise legal rights, titles, or authorities in and to the certain and related computer software program, software code, and software documentation identified as ServiceQueue, including but not limited to any and all "Life Systems Software – Software As A Service (SaaS) Agreement[s]," "Life Systems Software License Agreement[s]," "Life Systems Software Technical Service Agreement[s]; "Life Systems Software HIPAA Business Associate Agreement[s]," and "Technical Support Renewal Statement[s]" related to ServiceQueue, except that pursuant to Division III, Paragraph 6 of this Agreement, Selling Parties are entitled to and shall be issued a non-expiring, multi-user copy of the Service Queue software and its subprograms for the sole purpose of maintaining Protected Health Information records necessary to comply with requests from patients, insurance carriers, or any other authorized entity subject to compliance with state and federal laws, including maintaining corporate records necessary to comply with federal and state business regulations, laws, and rules;

(f) The Selling Parties' existing service agreements and licensing agreements, including but not limited to any and all "Life Systems Software – Software As A Service (SaaS) Agreement[s]," "Life Systems Software License Agreement[s]," "Life Systems Software Technical Service Agreement[s]; "Life Systems Software HIPAA Business Associate Agreement[s]," and "Technical Support Renewal Statement[s]";

(g) The Selling Parties' Intellectual Property Rights and otherwise legal rights, titles, or authorities of and to the "Chronic Watch Software Development Service Agreement" between Life Systems, Inc. and Chronic Watch Pvt. Ltd;

(h) The Selling Parties' Intellectual Property Rights and otherwise legal rights, titles, or authorities of and to the "ChiroSuiteEHR" trademark, registered with the United States Patent and Trademark Office, serial number 78911289, effectively registered on April 24, 2007.

(i) The Selling Parties' Intellectual Property Rights and otherwise rights, titles, or authorities of and to the "ChiroPad" trademark, registered with the United States Patent and Trademark Office, serial number 78346569, effectively registered on January 25, 2005;

3

Initials:_____    Initials:_____
*AB*

(j) The Selling Parties' Intellectual Property Rights and otherwise legal rights, titles, or authorities of and to the "ChiroOffice" trademark, registered with the United States Patent and Trademark Office, serial number 78718773, effectively registered on October 24, 2006;

(k) The Selling Parties' Intellectual Property Rights and otherwise legal rights, titles, or authorities of and to the "Paraphrase" trademark, registered with the United States Patent and Trademark Office, serial number 78346680, effectively registered on September 13, 2005;

(l) The Full Customer List for Life Systems, Inc., including complete contact information, documentation, records, and other information for all prior and existing Customers ("Customers List");

(m) The internet domain names and registrations that are held or owned by Seller related to Life Systems, Inc., the ChiroSuiteEHR software, and all marketing on behalf of Life Systems, Inc. or ChiroSuiteEHR, a list of which is attached as Exhibit E, as well as all subdomain names to the listed domain names;

(n) The internet domain and website content, including written, audio, video, recordings, or systems owned or used by Seller that is used by or related to Life Systems Inc. or the ChiroSuiteEHR family of products or services;

(o) All of Seller's electronic materials, promotional materials, marketing materials, advertising material, and all other written materials owned or used by Seller as related to the ChiroSuite or ChiroSuiteEMR family of products.

(p) All of Seller's marketing and sale information, and plans, pricing, and other related information related to the ChiroSuite or ChiroSuiteEMR family of products and services;

(q) Licenses to assets and properties of third parties as reflected in Exhibit D;

(r) The equipment, computers, or machinery owned by Seller, a list of which is attached as Exhibit C;

(s) All of Selling Parties' Intellectual Property Rights and otherwise rights, titles, or authorities of and to the telephone line for the telephone number: (800-543-3001); and

(t) All goodwill associated with Seller's business and the Assets.

*Paragraph 2. Outstanding Account Receivables.* Notwithstanding any other paragraph in this Agreement, the Assets shall not include, and Buyer shall not purchase from Seller, nor shall Seller sell to Buyer, any outstanding account receivables possessed by Seller at the time of or prior to Closing. Any and all account receivables, promissory notes, debts owed to Seller, or any outstanding obligation Seller is entitled to shall be free and clear from this Agreement, and Buyer shall have no right or entitlement to those assets. Seller shall have the right to continue to pursue collection of any outstanding account receivables as of Closing; and Buyer shall have no claim on the funds obtained by Seller for these outstanding account receivables.

*Paragraph 3. Outstanding Account Payables.* Notwithstanding any other paragraph in this Agreement, the Assets shall not include, and Buyer shall not purchase or acquire from Seller, nor shall Seller sell or assign to Buyer, any outstanding account payables possessed by Seller at the time of or prior to Closing. Any and all account payables, promissory notes owed, debts owed by

4

Initials:_____      Initials:_____

*AB*

seller, or any other outstanding obligation Seller is responsible for shall be free and clear from this Agreement, and Buyer shall have no responsibility or obligation to those liabilities.

*Paragraph 4. Consideration From Buyer.* As full payment for the transfer of the Assets to Buyer, Buyer shall deliver to Seller Three Hundred Seventy Thousand United States Dollars ($370,000.00 USD), in accordance with the provisions described herein, and subject to the terms and conditions described hereafter, the following (collectively, the Purchase Price):

(a) Nineteen Thousand United States Dollars ($19,000.00 USD) upon execution of this Agreement to be held in trust by Seller's attorney until Closing, at which time shall be released to Seller;

(b) Two Hundred Seventy-One Thousand United States Dollars ($271,000.00 USD) at the Closing; and

(c) Eighty Thousand United States Dollars ($80,000.00 USD) in the form of a promissory note (Note) and security agreement (Security Agreement) from Buyer to Seller, personally guaranteed by Nischal Sanghal, sole shareholder of Buyer, and attached as Exhibit A and Exhibit B, respectively.

*Paragraph 5. Tax Characterization.* Each of the parties agrees to report the transactions contemplated by this Agreement for all Tax purposes (including in Tax returns) in a manner that is consistent with the allocation of the Purchase Price described in Paragraph 2 and not to take any position inconsistent with such allocation in any Tax return, refund claim, or any litigation relating to Taxes.

## DIVISION II
## WARRANTIES OF SELLING PARTIES

*Paragraph 1. Seller's Warranties.* Selling Parties, jointly and severally, warrant that:

*Paragraph 2. Organization, Standing and Qualification of Seller.* Seller is a corporation duly organized, validly existing, and in good standing under the laws of New Jersey and has all necessary corporate powers to own its properties and operate its business as now owned and operated by it. Neither the ownership of its properties nor the nature of its business requires Seller to be qualified to do intrastate business as a foreign corporation in any other jurisdiction. Seller represents and warrants that Seller has not used any other business names, fictitious names, or any other addresses within the three years past.

*Paragraph 3. Compliance with Laws.* To the knowledge of Seller and Shareholder, Seller has complied in all material respects with all federal, state, and local statutes, laws, and regulations. Seller has not received any notice asserting any violation by either of them of any statute, law, or regulation that has not been remedied before the date of this Agreement.

*Paragraph 4. Litigation.* There is no pending, or, to the best knowledge of Selling Parties, threatened Proceeding against or affecting Seller or any of their businesses, assets, or financial condition.

Initials:_____     Initials:_____

*AB*

*Paragraph 5. Seller's Cooperation.*

(a) Selling Parties agree to cooperate and assist Buyer with technical and operational support for sixty (60) days following the Closing date. Assistance may include, but is not limited to, Selling Parties' cooperation in transitioning operations from Seller to the Buyer, as well as providing technical support to continue the servicing of all assigned contracts, licenses, obligations, and responsibilities to and for Customers.

(b) Selling Parties, at any time on or after the execution of this Agreement, shall execute, acknowledge, and deliver any further deeds, assignments, conveyances, and other assurances, documents, and instruments of transfer, reasonably requested by Buyer, and shall take any other action consistent with the terms of this Agreement that may reasonably be requested by Buyer for the purpose of assigning, transferring, granting, conveying, and confirming to Buyer, or reducing to possession, any or all property to be conveyed and transferred under this Agreement. If requested by Buyer, Selling Parties shall prosecute or otherwise enforce in its own name for the benefit and under the direction of Buyer, any claims, rights, or benefits that are transferred to Buyer under this Agreement and that require prosecution or enforcement in Seller's or Shareholder's name. Any prosecution or enforcement of claims, right, or benefits under this paragraph shall be solely at Buyer's expense, unless the prosecution or enforcement is made necessary by a breach of this Agreement by any of the Selling Parties.

(c) Selling Parties agree to fully cooperate with Buyer with all necessary actions, executions, or acknowledges pertaining to tax liabilities, obligations, tax clearances, bulk sale clearances, and all other cooperation to complete the terms of this Agreement.

(d) Selling Parties shall stop processing all charges, accounts receivables accrued on or after the date of Closing, and accounts on the date of Closing, permitting the merchant account and bank deposit information to be adjusted. Selling Parties shall not interfere or impede Buyer's rights to accounts receivables or collection of payments beginning on the date of Closing.

*Paragraph 6. Authority and Consents.* Selling Parties have the right, power, legal capacity, and authority to enter into and perform their respective obligations under this Agreement (including the sale of the Assets to Buyer), and no approvals or consents of any Persons other than Selling Parties are necessary in connection with the sale of the Assets to Buyer and the performance by Seller of its obligations under this Agreement. The execution, delivery, and performance of this Agreement by Seller and the consummation of the transactions contemplated have been duly authorized by all necessary corporate action on the part of Seller.

*Paragraph 7. MU 2014 Certification.* Selling Parties agree to guarantee completion of the MU 2014 certification regarding the Assets within 60 days after Closing at the expense of the Selling Parties. Selling Parties' failure to comply with this warranty shall constitute a material breach.

Initials:_____     Initials:_____

*AB*

*Paragraph 8. Shareholder's Competition.* In consideration for the payment by Buyer described in Paragraph 3 of Division I and as long as Buyer is in compliance with the Security Agreement and Note, Shareholder shall not, at any time within the 5-year period immediately following the Closing date, directly or indirectly engage in, or have any interest in any Entity (whether as an employee, officer, director, agent, security holder, creditor, consultant, or otherwise) that engages in any activity in the counties and cities where any existing or prior Customers are located or in the counties and cities Selling Parties have conducted any business that involved Assets, that is the same as, similar to, or competitive with any activity now engaged in by Selling Parties (or any successor or successors of either) in any of these counties or cities as long as Buyer (or any successor) engages in the activity in such county or city.

The parties intend that the covenant contained in the preceding portion of this section be construed as a series of separate covenants, one for each county and city specified or generally referenced. Except for geographic coverage, each such separate covenant shall be considered identical in terms to the covenant contained in the preceding paragraph. If, in any Proceeding, a court refuses to enforce any of the separate covenants included in this paragraph, the unenforceable covenant shall be considered eliminated from these provisions for the purpose of those Proceedings to the extent necessary to permit the remaining separate covenants to be enforced.

Shareholder shall not divulge, communicate, use to the detriment of Buyer or for the benefit of any other Person, or misuse in any way, any confidential information or trade secrets of Seller or Shareholder, including personnel information, secret processes, know-how, customer lists, recipes, formulas, or other technical data. Shareholder acknowledges and agrees that any information or data he has acquired on any of these matters or items was received in confidence and as a fiduciary of Seller and Shareholder.

**DIVISION III**
**WARRANTIES OF BUYER**

*Paragraph 1. Buyer's Warranties.* Buyer warrants the following:

(a) Buyer is a corporation duly organized, existing, and in good standing under the laws of California. The execution and delivery of this Agreement and the consummation of this transaction by Buyer have been duly authorized, and no further corporate authorization is necessary on the part of Buyer.

(b) No consent, approval, or authorization of, or declaration, filing, or registration with, any Governmental Authority is required to be made or obtained by Buyer in connection with the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.

(c) Buyer has completed and is satisfied with its due diligence of Seller, Selling Parties, Assets, and all liabilities or obligations.

*Paragraph 2. Authority and Consents.* Buyer has the right, power, legal capacity, and authority to enter into and perform their respective obligations under this Agreement (including

Initials:_____     Initials:_____

*AB*

the purchase of the Assets from Selling Parties), and no approvals or consents of any Persons other than Buyer is necessary in connection with the sale of the Assets to Buyer and the performance by Buyer of its obligations under this Agreement. The execution, delivery, and performance of this Agreement by Buyer and the consummation of the transactions contemplated have been duly authorized by all necessary corporate action on the part of Buyer.

*Paragraph 3. No Unreasonable Delay.* Buyer shall not unreasonably delay or unnecessarily refuse to perform services to clients or Customers originated from the Assets purchased from Seller. Buyer shall make all reasonable efforts to continue to provide uninterrupted service and support to such clients or Customers. Buyer acknowledges that time is of the essence with respect to all services rendered to clients or customers originating from the Assets purchased from Seller.

*Paragraph 4. Assumption of Liabilities.* From and after the Closing, Buyer shall assume all of Selling Parties' rights and obligations arising under the ownership and maintenance of the Assets transferred under this Agreement.

*Paragraph 5. Bulk Sale Clearance.* Following the execution of this Agreement, Buyer shall provide proper notice to the relevant Governmental Authority of the Agreement to obtain a tax clearance certificate.

*Paragraph 6. Issuance of Software to Shareholder.* It is acknowledged that Shareholder has used the ChiroSuiteEHR software in Shareholder's practice for patient records, also known as Protected Health Information ("PHI"), and is required by applicable chiropractic laws to retain this PHI for many years. For this reason, Buyer agrees to issue a non-expiring, multi-user copy of the ChiroSuiteEHR software and its subprograms, as described in sections A, B, and F in Division I of this agreement, for the sole purpose of maintaining the PHI records necessary to comply with requests from patients, insurance carriers, or any other authorized entity. Shareholder may not sell, market, or use the ChiroSuiteEHR software or its subprograms for any other purpose than maintaining PHI as required pursuant to applicable laws. Shareholder's failure to comply with this limited use scope shall constitute a material breach of this Agreement.

## DIVISION IV
## OBLIGATIONS AT CLOSING

*Paragraph 1. Time and Place.* The sale and transfer of the Assets by Seller to Buyer (the Closing) shall take place at the offices of Joseph D. Greco, Jr., Esq., attorney for Selling Parties, at 51 Newark Street, Suite 404, Hoboken, NJ 07030, at 10:00 a.m. local time, on twenty-one (21) days after the execution of this Agreement, or at such other time and place as the parties may agree to in writing.

*Paragraph 2. Selling Party's Obligations at Closing.* At the Closing, with the consummation of the transfer, Seller, through its officers, agents, and employees, will put Buyer into full possession and enjoyment of all assets to be conveyed and transferred by this Agreement, including but not limited to:

Initials:_____     Initials:_____
*AB*

(a) Assignments of all leaseholds, service agreements, and all other agreements involving Assets, properly executed and acknowledged by Corporation, and accompanied by all consents of lessors and necessary parties required by this Agreement and the leases or agreements being assigned;

(b) Instruments of assignment and transfer of all other property of Corporation of every kind and description and wherever situated, including all its interest in trademarks identified in Paragraph 1 of Division I; all other trademarks, rights under agreements; trade names; copyrights, and other tangible or intangible property, subject to the terms and conditions of the Security Agreement and Note;

(c) Certified resolutions of Seller's board of directors, in form satisfactory to counsel for Buyer, authorizing the execution and performance of this Agreement and all actions to be taken by Selling Parties under this Agreement; and

(d) All equipment, computers, and machinery of the Assets shall be shipped by Selling Parties to Buyer at Broker's sole expense.

*Paragraph 3. Buyer's Obligations at Closing.* At the Closing, consistent with Paragraph 3 of Division I, Buyer shall deliver to the Seller:

(a) A wire transfer in immediately available funds in the amount of $271,000.00 USD;

(b) A fully executed promissory note, reflected in Exhibit A of this Agreement, in the amount of $80,000.00 USD;

(c) Authorization for the immediate release of the $19,000.00 USD held in the attorney escrow account of Selling Parties' attorney as described in Division I, Paragraph 4(a).

## DIVISION V
## OBLIGATIONS AFTER CLOSING

*Paragraph 1. Buyer's Obligations After Closing.* After the Closing, Buyer shall deliver or cause to be delivered to Selling Parties all required Royalties, future payments, documents, records, invoices, statements, accounting access, and e-mails in accordance with Division I, Paragraph 3, and all of Buyer's obligations in fulfilling and fully satisfying the Purchase Price under this Agreement.

*Paragraph 2. Buyer's Indemnity.* From and after the Closing, Buyer shall indemnify and hold harmless Shareholder and Seller against, and in respect of, all claims, judgments, damages, penalties, fines, costs, liabilities or losses which arise during or after the Closing from any of the services rendered by Buyer.

*Paragraph 3. Seller's Indemnity.* From and after the Closing, Seller and Shareholder shall, jointly and severally, indemnify and hold harmless Buyer against and in respect of, all claims, judgments, damages, penalties, fines, costs, liabilities or losses that Buyer, its directors, officers, employees, or shareholders may incur or suffer that arise from any breach of or failure by Selling Parties to perform any of their representations, warranties or agreements prior to and up until the Closing.

Initials:_____   Initials:_____

*AB*

*Paragraph 4. Seller's Dissolution.* Seller must remain active following the Closing until Seller has received all payments under this Agreement, the Security Agreement, and the Note. After such time, Seller shall take all action required to dissolve and settle its bona fide debts, and distribute to shareholders, in the manner provided by this paragraph but in compliance with applicable law, all its remaining right, title, and interest in and to its assets (other than the Assets being sold to Buyer under this Agreement), including the consideration to be received by it under this Agreement; and as soon as practicable after the closing date, to liquidate completely and terminate its corporate existence. From and after the Closing, Seller shall not engage in any other business or activity, except as required under this Agreement or to complete its liquidation and dissolution. Seller will be dissolved only after full and complete payment and compliance with the terms of the Security Agreement and Note.

## DIVISION VI
## COMMISSIONS

*Paragraph 1.* Selling Parties represents and warrants that it has contracted with Synergy Business Brokers LLC ("Broker") in connection with the engagement of this Agreement. Selling Parties further represents and warrants that in contracting with Broker, Selling Parties shall pay Broker a commission fee in the sum of Thirty Thousand Seven Hundred United States Dollars ($30,700.00 USD). Selling Parties is solely responsible for this fee.

*Paragraph 2.* Selling Parties and Buyer each indemnify and hold harmless one another against any Losses incurred by reason of any brokerage or other commission or finder's fee alleged to be payable because of any act, omission, or statement of the indemnifying party.

## DIVISION VII
## FORM OF AGREEMENT

*Paragraph 1. Effect of Headings.* The subject headings of the paragraphs and subparagraphs of this Agreement are included for convenience only and shall not affect the construction or interpretation of any of its provisions.

*Paragraph 2. Word Usage.* Unless the context clearly requires otherwise:

(a) Plural and singular numbers shall each be considered to include the other;

(b) The masculine, feminine, and neuter genders shall each be considered to include the others;

(c) "Or" is not exclusive;

(d) "Includes" and "including" are not limiting;

(e) Reference to any statute is a reference to that statute as amended to the date of this Agreement;

Initials:_____     Initials:_____

*AB*

(f) Reference to any document is to that document, as amended to the date of this Agreement, including all exhibits and schedules, if any; and

(g) "Known to" or "knowledge of" a party means, with respect to any fact, circumstance, event, or other matter in question, the actual knowledge of it with respect to an individual, if knowledge refers to the knowledge of an individual, and of an officer or director of a party if knowledge refers to a party that is not an individual.

*Paragraph 3. Entire Agreement; Modification; Waiver.* This agreement constitutes the entire agreement between the parties pertaining to the subject matter contained in it and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties. No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by all the parties. No waiver of any of the provisions of this Agreement shall be considered, or shall constitute, a waiver of any other provision, and no waiver shall constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

*Paragraph 4. Counterparts.* Executed counterparts of this Agreement may be delivered by facsimile transmission or by delivery of a scanned counterpart in portable document format (PDF) by e-mail, in either case with delivery confirmed. On such confirmed delivery, the signatures in the facsimile or PDF data file shall be deemed to have the same force and effect as if the manually signed counterpart had been delivered to the other party in person.

*Paragraph 5. Governing Law.* This Agreement shall be construed in accordance with, and governed by, the laws of the State of New Jersey as applied to contracts that are executed and performed entirely in the State of New Jersey.

*Paragraph 6. Severability.* If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, it is the intent of the parties that all other provisions of this Agreement be construed to remain fully valid and enforceable

## DIVISION VIII
## PARTIES

*Paragraph 1. Parties in Interest.* Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under, or by reason of, this Agreement on any Persons other than the parties to it and their respective successors and assigns; nothing in this Agreement is intended to relieve or discharge the obligation or liability of any third party to any party to this Agreement; and no provision shall give any third party any right of subrogation or claim against any party to this Agreement.

*Paragraph 2. Assignment.* This agreement shall be binding on, and shall inure to the benefit of, the parties to it and their respective heirs, legal representatives, successors, and assigns, provided that the Selling Parties may not assign their obligations under this Agreement, and before the closing, Buyer may not assign any of its rights under this Agreement except to a wholly owned subsidiary corporation of Buyer. No such assignment by Buyer to its wholly owned subsidiary shall relieve Buyer of any of its obligations or duties under this Agreement.

Initials:_____       Initials:_____

*AB*

*Paragraph 3. Notices.* All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be considered to have been duly given on the date of service if served personally on the party to whom notice is to be given, or on the third day after mailing if mailed to the party to whom notice is to be given, by first-class mail, registered or certified, postage prepaid, and properly addressed as follows:

| | | |
|---|---|---|
| To Selling Parties: | Dr. Paul B. Bindell | Joseph D. Greco, Jr. |
| | Life Systems, Inc. | Joseph D. Greco, Jr., Esq., LLC |
| | 75 East Main Street | 51 Newark St, Ste 404 |
| | Rockaway, NJ 07866 | Hoboken, NJ 07030 |
| | | |
| To Buyer at: | Life Systems Software Inc. | Alvin H. Lee |
| | Attention: Nischal Sanghal | Law Offices of Alvin H. Lee |
| | 2603 Camino Ramon, Ste 200 | 6400 Village Pkwy, Ste 201 |
| | San Ramon, CA 94583 | Dublin, CA 94568 |

Each party agrees to notify the other in the event of a move within fourteen calendar days of such move until the Note has been satisfied in full.

## DIVISION IX
## REMEDIES

*Paragraph 1. Damages for Breach.* It is acknowledged that a breach of the Agreement by either party shall cause the non-breaching party to incur substantial economic damages and losses of types and in amounts that cannot be anticipated. Accordingly, Seller and Selling Parties agree that Buyer is entitled to seek all actual damages Buyer suffers as a result of Seller or Selling Parties' breach of this Agreement. Buyer agrees that Seller or Selling Parties are entitled to seek all actual damages Seller or Selling Parties suffer as a result of Buyer's breach of this Agreement, taking into account Seller or Selling Parties' reacquisition of the assets subject to the Note and Security Agreement.

*Paragraph 2. Recovery of Litigation Costs.* If any legal Proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorney fees and other costs incurred in that Proceeding, in addition to any other relief to which they may be entitled.

## DIVISION X
## NATURE AND SURVIVAL OF REPRESENTATIONS AND OBLIGATIONS

*Paragraph 1. Nature and Survival of Representations and Obligations.* No representations or warranties whatever are made by any party except as specifically set forth in this Agreement or other writing provided for in this Agreement. All statements contained in any of these instruments or other writings shall be considered to be warranties under this Agreement. The

Initials:_____     Initials:_____

*AB*

warranties, covenants, and promises herein shall survive the Closing date until all covenants, obligations, and responsibilities under this Agreement have been fully and completely satisfied.

[*The remainder of this page intentionally left blank.*

Initials:_____    Initials:_____

*AB*

**IN WITNESS WHEREOF**, the parties to this Agreement have duly executed it on the day and year first above written.

**APPROVED AS TO FORM:**

**BUYER:**

By: _Nischal Sanghal_

Nischal Sanghal
President
Life Systems Software Inc.
**a California corporation**

_____

Alvin H. Lee
**Attorney for Buyer**

**SELLING PARTIES:**

By: _____

Dr. Paul B. Bindell
President
Life Systems, Inc.,
**a New Jersey corporation** (FEIN 22-3254430)

_____

Joseph D. Greco, Jr.
**Attorney for Selling Parties**

By: _____

Paul B. Bindell
Shareholder

By: _____

Avraham Bindell
Shareholder

Initials:_____    Initials:_NS_

**IN WITNESS WHEREOF**, the parties to this Agreement have duly executed it on the day and year first above written.

**APPROVED AS TO FORM:**

**BUYER:**

**By:** _____          _____
      Nischal Sanghal                                   Alvin H. Lee
      President                                         **Attorney for Buyer**
      Life Systems Software Inc.
      **a California corporation**


**SELLING PARTIES:**

**By:** _____          _____
      Dr. Paul B. Bindell                               Joseph D. Greco, Jr.
      President                                         **Attorney for Selling Parties**
      Life Systems, Inc.,
      **a New Jersey corporation**  (FEIN 22-3254430)

**By**: _____
      Paul B. Bindell
      Shareholder

**By**: _____
      Avraham Bindell
      Shareholder

Initials:_____   Initials:_____

**EXHIBIT A**

# PROMISSORY NOTE

Date: December 14, 2015

**FOR VALUE RECEIVED**, the undersigned Life Systems Software, Inc. ("Borrower"), a California corporation, at 2603 Camino Ramon, Suite 200, San Ramon, CA 94583, promises to pay to the order of Life Systems, Inc., a New Jersey corporation, under the terms of repayment described herein, the principal sum of Eighty Thousand United States Dollars ($80,000.00 USD), together with interest on the principal amount of this Promissory Note in the sum of Nine Thousand Five Hundred Twenty-eight United States Dollars and thirteen cents ($9,528.13) over a term of thirty-nine (39) months. The interest rate or fee shall not be adjusted hereafter.

Repayment of this Note is to be paid in:

1. Three (3) equal monthly payments of Three Thousand United States Dollars and seven cents ($3,000.07 USD), beginning ninety (90) days after the execution of this Note; and
2. Thirty-Three (33) equal monthly payments of Two Thousand Four Hundred Forty United States Dollars and twenty-five cents ($2,440.25 USD), beginning one hundred twenty (120) days after the execution of this Note.

At any time and without notice, the undersigned, at its election, may pay without penalty or premium the outstanding amount of the Note in whole or in part together with accrued and unpaid interest.

The undersigned waives presentment for payment, demand, notice of dishonor, protest, or any renewal or extension of the Note.

The promises, terms, and conditions contained in this Note bind the undersigned, his or her heirs, executors, administrators, personal representatives, and assigns.

**IN WITNESS WHEREOF**, the undersigned execute this Note as of the day and year first written above.

By: _Nischal Sanghal_
    Nischal Sanghal
    Life Systems Software, Inc.

## PERSONAL GUARANTEE

Nischal Sanghal, the founder of Life Systems Software, Inc, unconditionally guarantees all of the obligations of the Borrower under this Note.

By: _Nischal Sanghal_
    Nischal Sanghal

**EXHIBIT B**

## SECURITY AGREEMENT

1. <u>Grant</u>. On this day of 24th day of December, 2015, Life Systems Software, Inc., a California corporation with its principal place of business at 2603 Camino Ramon, Suite 200, San Ramon, CA 94583(hereinafter called **"Debtor"**), for valuable consideration, receipt whereof is acknowledged, grants to Life Systems, Inc. 75 East Main Street, Rockaway, NJ 07886, a New Jersey corporation with its principal place of business at Life Systems, Inc. (hereinafter called **"Secured Party"**) a security interest in, and mortgages to Secured Party, the following described property and interests in property of Debtor (hereinafter called the **"Collateral"**):

To secure payment of the following obligations of Debtor to the Secured Party (all hereinafter called the **"Obligations"**):

   (i)   The principal sum of Eighty Thousand United States Dollars ($80,000.00 USD), together with interest on the principal amount of this Promissory Note in the sum of Nine Thousand Five Hundred Twenty-eight United States Dollars and thirteen cents ($9,528.13) over a term of thirty-nine (39) months. The interest rate or fee shall not be adjusted hereafter.

   Repayment of this Note is to be paid in:

   1. Three (3) equal monthly payments of Three Thousand United States Dollars and seven cents ($3,000.07 USD), beginning ninety (90) days after the execution of this Note; and
   2. Thirty-three (33) equal monthly payments of Two Thousand Four Hundred Forty United States Dollars and twenty-five cents ($2,440.25 USD), beginning one hundred twenty (120) days after the execution of this Note

   At any time and without notice, the undersigned, at its election, may pay without penalty or premium the outstanding amount of the Note in whole or in part together with accrued and unpaid interest.

   (ii)  Guarantor: Nischal Sanghal will personally guarantee payment evidenced by a Promissory Note.

   (iii) Collateral is defined as the assets listed in the purchase and sale of asset agreement which are incorporated herein by reference.

2. <u>Warranties and Covenants of Debtor</u>. Debtor warrants and covenants that:

   (a)  Except for the security interest granted hereby to Life Systems, Inc., Debtor is the owner of the Collateral free from any adverse lien, security interest or encumbrance; and Debtor will defend the Collateral against all claims and demands of all persons at any time claiming the same or any interest therein.

(b) No Financing Statement covering any of the Collateral or any proceeds thereof is on file in any public office, except in favor of Life Systems, Inc. The Debtor shall immediately notify the Secured Party in writing of any change in name, address, identity or corporate structure from that shown in this Agreement and shall also upon demand furnish to the Secured Party such further information and shall execute and deliver to the Secured Party such financing statements and other documents in form satisfactory to Secured Party and shall do all such acts and things as Secured Party may at any time or from time to time reasonably request or as may be necessary or appropriate to establish and maintain a perfected security interest in the Collateral as security for the Obligations, subject to no adverse liens or encumbrances; and Debtor will pay the cost of filing the same or filing or recording this agreement in all public offices wherever filing or recording is deemed by Secured Party to be necessary or desirable. A carbon, photographic or other reproduction of this agreement is sufficient as a financing statement.

(c) Debtor shall not sell or offer to sell, assign, pledge, lease or otherwise transfer or encumber the Collateral or any interest therein, without the prior written consent of Secured Party.

(d) Debtor shall keep the Collateral at all times insured against risks of loss or damage by fire (including so-called extended coverage), theft, earthquake, flood, natural disasters, and such other casualties as Secured Party may reasonably require, including collision in the case of any motor vehicles, all in such amounts, under such forms of policies, upon such terms, for such periods and written by such companies or underwriters as Secured Party may approve, losses in all cases to be payable to Secured Party and Debtor as their interests may appear. All policies of insurance shall provide that Secured Party and Debtor as their interests may appear. All policies of insurance shall provide that Secured Party's interest therein shall not be invalidated by the act, omission or neglect of anyone other than Secured Party and for at least ten days' prior written notice of cancellation to Secured Party. Debtor shall furnish Secured Party with certificates of such insurance or other evidence satisfactory to Secured Party as to compliance with the provisions of this paragraph. Secured Party may act as attorney for Debtor in making, adjusting and settling claims under and cancelling such insurance and endorsing Debtor's name on any drafts drawn by insurers of the Collateral.

(e) Debtor will keep the Collateral free from any adverse lien, security interest or encumbrance and in good order and repair, shall not waste or destroy the Collateral or any part thereof, and shall not use the Collateral in violation of any statute, ordinance or policy of insurance thereon. The secured party shall be named as an additional Insured Primary Lien Holder and shall be paid first up to the amount of the debt in the event of a claim.

Secured Party may examine and inspect the Collateral at any reasonable time or times, wherever located.

v

(f) Debtor will pay promptly when due all taxes and assessments upon the Collateral or for its use or operation or upon this Agreement or upon any note or notes evidencing the Obligations.

3. <u>Additional Right of Parties</u>. At its option, Secured Party may discharge taxes, liens or security interests or other encumbrances at any time levied or placed on the Collateral, may place and pay for insurance on the Collateral upon failure by the Debtor, after having been requested to do so, to provide insurance satisfactory to the Secured Party, and may pay for the maintenance, repair, and preservation of the Collateral. To the extent permitted by applicable law, Debtor agrees to reimburse Secured Party on demand for any payment made, or any expense incurred by Secured Party pursuant to the foregoing authorization. Until default Debtor may have possession of the Collateral and use it in any lawful manner not inconsistent with this agreement and not inconsistent with any policy of insurance thereon.

4. <u>Events of Default</u>. Debtor shall be in default under this agreement upon the occurrence of any of the following events or conditions, provided Debtor has not cured the default within 21 days of notice: (a) default in the payment or performance of any of the Obligations or of any covenants or liabilities contained or referred to herein or in any of the Obligations or of any covenants or liabilities contained or referred to herein or in any of the Obligations; (b) any warranty, representation or statement made or furnished to Secured Party by or on behalf of Debtor proving to have been false in any material respect when made or furnished; (c) loss, theft, substantial damage, destruction, sale or encumbrance to any of the Collateral, or the making of any levy, seizure or attachment thereof or thereon; (d) dissolution, termination of existence, filing by Debtor or by any third party against Debtor of any petition under any Federal bankruptcy statute, insolvency, business failure, appointment of a receiver of any part of the property of, or assignment for the benefit of creditors by, Debtor; or (e) the occurrence of an event of default in any agreement between Debtor and/or Secured Party and Guarantor, Nischal Sanghal, personally.

5. <u>Remedies</u>. UPON DEFAULT AND AT ANY TIME THEREAFTER, SECURED PARTY MAY DECLARE ALL OBLIGATIONS SECURED HEREBY IMMEDIATELY DUE AND PAYABLE AND SHALL HAVE THE REMEDIES OF A SECURED PARTY UNDER THE UNIFORM COMMERCIAL CODE OF New Jersey including without limitation the right to take immediately and exclusive possession of the Collateral, or any part thereof, and for that purpose may, so far as Debtor can give authority therefore, with or without judicial process, enter (if this can be done without breach of the peace), upon any premises on which the Collateral or any party thereof may be situated and remove the same there from (provided that if the Collateral is affixed to real estate, such removal shall be subject to the conditions stated in the Uniform Commercial Code of New Jersey; and the Secured Party shall be entitled to hold, maintain, preserve and prepare the Collateral for sale, until disposed of, or may propose to retain the Collateral subject to Debtor's right of redemption in satisfaction of the Debtor's Obligations as provided in the Uniform Commercial Code of New Jersey Secured Party without removal may render the Collateral unusable and dispose of the Collateral on the Debtor's premises. Secured Party may require Debtor to assemble the Collateral and make it available to Secured Party for possession at a place to be designated by Secured Party, which is reasonably convenient to both parties. Unless the Collateral is perishable or threatens to decline speedily in value or is of a type

customarily sold on a recognized market, Secured Party will give Debtor at least 5 days' notice of the time and place of any public sale thereof or of the time after which any private sale or any other intended disposition thereof is to be made. The requirements of a reasonable notice shall be met if such notice is mailed, postage prepaid, to the address of Debtor shown at the beginning of this agreement at least ten days before the time of the sale or disposition. Secured Party may sell the collateral repossessed at any public sale. The net proceeds realized upon any such disposition, after deduction for the expenses of retaking, holding, preparing for sale or lease, selling, leasing, and the like and the reasonable attorney's fees, and legal expenses incurred by Secured Party, shall be applied in satisfaction of the Obligations secured hereby. The Secured Party will account to the Debtor for any surplus realized on such disposition and the Debtor shall remain liable for any deficiency.

The remedies of the Secured Party hereunder are cumulative and the exercise of any one or more of the remedies provided for herein or under the Uniform Commercial Code of New Jersey shall not be construed as a waiver of any of the other remedies of the Secured Party so long as any part of the Debtor's Obligation remains unsatisfied.

To be clear, if the Buyer defaults on the $80,000, or any portion thereof, then Seller has the full and complete right and obligation to:

    a.  Resume all the business activities related to the Assets that had been sold to the Buyer, even though this would place the Seller in competition with the Buyer.

    b.  Reclaim the full and complete client list with the full right to contact and engage in business with any and all clients.

    c.  Reclaim full and complete ownership of all copyrights related to the Assets.

    d.  Keep all monies paid by the Buyer to the Seller, so that there would be no refund of any amount given and no penalties or other obligations required of Seller to give to Buyer.

6.  <u>General</u>. No waiver by Secured Party of any default shall operate as a waiver of any other default or of the same default on a future occasion. All rights of Secured Party there under shall inure to the benefit of its successors and assigns; and all obligations of Debtor shall bind its successors or assigns. If there be more than one Debtor, their obligations hereunder shall be joint and several. This agreement shall become effective when it is signed by the Debtor.

All rights of the Secured Party in, to and under this agreement and in to the Collateral shall pass to and may be exercised by any assignee thereof. The Debtor agrees that if the Secured Party gives notice to the Debtor of an assignment of said rights, upon such notice the liability of the Debtor to the assignee shall be immediate and absolute. The Debtor will not set up any claim against the Secured Party as a defense, counterclaim or set-off to any action brought by any such assignee for the unpaid balance owed hereunder or for the possession of the Collateral, provided that Debtor shall not waive hereby any right of action to the extent that waiver thereof is expressly made unenforceable under applicable law.

If any provision of this agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the reminder of such provision or the remaining provisions of this agreement.

Secured Party: Life Systems, Inc.                    Debtor: Life Systems Software, Inc.

By: _____                    By: _Nischal Sanghal_
    Dr. Paul Bindell                                        Nischal Sanghal
    President                                               President

By: _____
    Avi Bindell
    Treasurer

If any provision of this agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the reminder of such provision or the remaining provisions of this agreement.

<u>Secured Party</u>: Life Systems, Inc.            <u>Debtor</u>: Life Systems Software, Inc.


By: _____              By: _____
    Dr. Paul Bindell                              Nischal Sanghal
    President                                     President


By: _____
    Avi Bindell
    Treasurer

**EXHIBIT C**

**Hardware Assets**

1.  DEVMASTER
Computer Description: Development
Location: OH
Form: Tower
Operating System: Windows XP Pro
CPU: Dual Xeon ES405
RAM: 4GB
HD: 1750 GB
Serial #:
Service Tag:
Express Service Code:

2.  PENTIUM
Computer Description: Install/VSS DB
Location: OH
Form: Mini Tower
Operating System: Windows 7 Pro
CPU: Core 2 Duo E6550
RAM: 4GB
HD: 1000 GB
Serial #:
Service Tag:
Express Service Code:

3.  DEV1
Computer Description: Development
Location: OH
Form: Tower
Operating System: Windows XP Pro
CPU: Pentium 4 3.6 GHz
RAM: 3 GB
HD: 1500 GB
Serial #:
Service Tag:
Express Service Code:

4.  DEV2
Computer Description: Development
Location: OH
Form: Laptop

Operating System: WinXP Pro
CPU: Pentium 4 3.6 GHz
RAM: 1 GB
HD: 37 GB
Serial #:
Service Tag: 1LNLCZ1
Express Service Code: 3486199789

5.  CENTRAL
Computer Description: File Server/DB
Location: NJ
Form: Mini Tower
Operating System: Windows 7 Pro
CPU: Core i7 3770 3.4 GHz
RAM: 16 GB
HD: 1000 GB
Serial #:
Service Tag: 1LNLCZ1
Express Service Code: 3486199789

6.  TECHSUPPORT01
Computer Description: Tech Support
Location: NJ
Form: Mini Tower
Operating System: Windows 7 Pro
CPU: Core i7 3770 3.4 GHz
RAM: 8 GB
HD: 2000 GB
Serial #:
Service Tag: 80V1XV1
Express Service Code: 174664173485

7.   TECHSUPPORT02
Computer Description: Tech Support
Location: NJ
Form: Mini Tower
Operating System: Windows 7 Pro
CPU: Core i7 3770 3.4 GHz
RAM: 16 GB
HD: 1000 GB
Serial #:
Service Tag: 1LMNCZ1
Express Service Code: 3484613485

8.   TECHSUPPORT03
Computer Description: Tech Support
Location: NJ
Form:
Operating System: Windows 7 Pro
CPU: Core 2 Duo 2.7 GHz
RAM: 4 GB
HD:
Serial #:
Service Tag:
Express Service Codes:

9.   OPTIDEV3
Computer Description: Sales
Location: NJ
Form: Tower
Operating System: Windows 7 Pro
CPU: Core i7 870 2.93 GHz
RAM: 4 GB
HD: 1250 GB
Serial #:
Service Tag: 7J49PN1
Express Service Code: 16393505293

10. TELEVANTAGE
Computer Description: Phone System
Location: NJ
Form: Tower
Operating System: Windows Server
2003
CPU: Pentium 4 2.8 GHz
RAM: 4 GB
HD: 2580 GB
Serial #: H085181
Service Tag:
Express Service Code:

11. LASER PRINTER
Description: Laser Printer
Model: Brother MFC-8910DW

12. DISPLAY BOOTH
Description: Two (2) Portable Display
Booths

i

13. Monitor 01
Manufacturer: Dell
Model: UltraSharp
Size: 19"
Serial Number:
MX09J36747605363AGTO

14. Monitor 02
Manufacturer: SVA
Model: VR-15A
Size: 15"
Serial Number: D209231401

15. Monitor 03
Manufacturer: SVA
Model: VR-15A
Size: 15"
Serial Number: D209231401

16. Monitor 04
Manufacturer: NEC
Model: MultiSyncLCD 1550V
Size: 15"
Serial Number: 3902C553

17. Monitor 05
Manufacturer: Samsung Porche
Model: 171P
Size: 17"
Serial Number: 6H17H4KT201979T

18. Monitor 06
Manufacturer: LG
Model: 500 LC
Size: 15"
Serial Number: 803KG00088

19. Monitor 07
Manufacturer: Dell
Model: 1704 FPTt
Size: 17"
Serial Number: CN-0Y42299-71618-
4AC-CA4E

20. Monitor 08
Manufacturer: Dell
Model: 1704 FPTt
Size: 17"
Serial Number: CN-0J6642-71618-534-
ABWB

21. Monitor 09
Manufacturer: Dell
Model: 1704 FPTt
Size: 17"
Serial Number: CN-0J6642-71618-537-
A193

22. Monitor 10
Manufacturer: Dell
Model:
Size: 19"
Serial Number: N-OUN492-73731-83D-
192M

23. Monitor 11
Manufacturer: Dell
Model: 1704 FPTt
Size: 17"
Serial Number: CN-0CC639-72872-
64K-63JT

24. Monitor 12
Manufacturer: Dell
Model: 1704 FPTt
Size: 17"
Serial Number: CN-0CC639-72872-
64D-28PL

25. Monitor 13
Manufacturer: Dell
Model: P2210
Size: 22"
Serial Number:

26. Monitor 14
Manufacturer: Dell
Model:
Size: 24"
Serial Number: CN-02GFKN-74445-
3BB-C585

27. Monitor 15
Manufacturer: Dell
Model:
Size: 22"
Serial Number: CN-0TYXD9-74445-
0AN-901L

**EXHIBIT D**

**Third Party Software**

| Name | Description | Type |
|------|-------------|------|
| ChronicWatch | Programming and Development services | Vendor Contract |
| ChronicWatch | Technical Support | Vendor Contract |
| UpDox | DIRECT Messaging Vendor | Vendor Contract |
| UpDox | Fax Line | Vendor Contract |
| UpDox | Patient Portal | Vendor Contract |
| ChiroOffice | | Trademark |
| ChiroPad | | Trademark |
| ChiroSuite | | Trademark |
| Paraphrase | | Trademark |
| DrFirst | E-Prescribe Functionality | Vendor Contract |
| GoToMeeting | Online Meetings for Sales | Vendor Contract |
| LogMeIn Rescue | Technical Support Remote Access Tool | Vendor Contract |
| Trizetto/GatewayEDI | Processing of digital claims through CO | Vendor Contract |
| Wizmo Web Hosting | Web Hosting for ChiroSuiteEHR CLOUD | Vendor Contract |
| ACT! | Sales Prospect Software, mostly obsolete by ServiceQueue | Office Software |
| ActiveThreed | ActiveX Component | Development Software |
| ActiveTreeView | ActiveX Component | Development Software |
| Calendar Widgets | ActiveX Component | Development Software |
| Data Widgets | ActiveX Component | Development Software |
| First Impression | ActiveX Component | Development Software |
| Formula One | ActiveX Component | Development Software |
| Visual Speller | ActiveX Component | Development Software |
| VSFlex | ActiveX Component | Development Software |
| VSView | ActiveX Component | Development Software |
| PDQComm 3.4 | ActiveX Component | Development Software |
| TX Text Control 5.2 | ActiveX Component | Development Software |
| TX Text Control 12 | ActiveX Component | Development Software |
| TX Text Control 17 | ActiveX Component | Development Software |
| TX Text Control 18 | ActiveX Component | Development Software |
| WebPicDeluxe 2.0 | ActiveX Component | Development Software |
| EZTwainPro 4.0 | ActiveX Component | Development Software |
| ComponentOne Studio 2006 | ActiveX Component | Development Software |
| ChadoSpellEditor | ActiveX Component | Development Software |
| TE Edit Control 17 | ActiveX Component | Development Software |
| Chilkat ActiveX Suite | ActiveX Component | Development Software |
| CutePDF 3.5 | ActiveX Component | Development Software |

**EXHIBIT E**

**Internet Website Domain Names**

| Domain Name | Points To | Expiration Date |
| --- | --- | --- |
| lifesystemssoftware.com | dns1.enterhost.com\|dns2.enterhost.com | 11/10/2015 |
| ehrsofware.com | dns1.enterhost.com\|dns2.enterhost.com | 11/17/2015 |
| ehrsofware.net | dns1.enterhost.com\|dns2.enterhost.com | 11/17/2015 |
| emrmobile.com | dns1.enterhost.com\|dns2.enterhost.com | 3/7/2016 |
| mobileemr.com | dns1.enterhost.com\|dns2.enterhost.com | 3/7/2016 |
| chiropad.info | Web Forwarding | 4/7/2016 |
| 4chiros.com | dns1.enterhost.com\|dns2.enterhost.com | 4/10/2016 |
| forchiros.com | dns1.enterhost.com\|dns2.enterhost.com | 4/10/2016 |
| thechiropracticsoftware.com | dns1.enterhost.com\|dns2.enterhost.com | 9/9/2016 |
| certifiedehrsoftware.com | dns1.enterhost.com\|dns2.enterhost.com | 10/6/2016 |
| certifiedehrsoftware.net | dns1.enterhost.com\|dns2.enterhost.com | 10/6/2016 |
| certifiedhealthcaresoftware.com | dns1.enterhost.com\|dns2.enterhost.com | 10/6/2016 |
| ehrhealthcaresoftware.com | dns1.enterhost.com\|dns2.enterhost.com | 10/6/2016 |
| chirooffice.biz | dns1.enterhost.com\|dns2.enterhost.com | 11/6/2016 |
| chiropad.tv | dns1.enterhost.com\|dns2.enterhost.com | 12/18/2016 |
| chiropad.com | dns1.enterhost.com\|dns2.enterhost.com | 3/8/2018 |
| chiropad.net | dns1.enterhost.com\|dns2.enterhost.com | 12/31/2018 |